**Gary A. THIESSEN, Plaintiff,**

v.

**GENERAL ELECTRIC CAPITAL CORPORATION, d/b/a GE Capital, and Montgomery Ward Credit Services, Inc., f/k/a Monogram Retailer Credit Services, Inc. Defendants.**

**No. 96–2410–JWL.**

United States District Court, D. Kansas.

June 23, 1998.

Bert S. Braud, Dennis E. Egan, The Popham Law Firm, Kansas City, MO, John M.

Klamann, Dirk L. Hubbard, Overland Park, KS, for Gary A. Thiessen, Gene Autry, Pamela S. Chudyba, Qwen Colwell, Barbara A. Croy, Jan L. Cullison, Robert Demartine, James C. Flower, Lawrence P. Fries, Terry M. Grisham, Elaine Hayden, Melva Heid, Linda L. Hess, Christopher P. Kaesberg, James Lawson, Brenda Lewis, Robert Marsonette, Ray Osburn, Kimberly Perron, Diana Polsinelli, Patricia Serra, Salli J. Shirey, Janice F. Trice.

Brian J. Finucane, Sharon D. Hess, Bioff, Singer & Finucane, Kansas City, MO, Glen D. Nager, Jones, Day, Reavis & Pogue, Washington, DC, Steven T Catlett, Matthew W. Lampe, Jones, Day, Reavis & Pogue, Columbus, OH, for General Electric Capital Corporation, Montgomery Ward Credit Services, Inc.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Gary A. Thiessen brought a collective action against defendants on behalf of himself and 22 opt-in plaintiffs under the Age Discrimination in Employment Act (ADEA). This matter is presently before the court on defendants' motion to decertify the collective action and to dismiss the opt-in plaintiffs (doc. # 319). For the reasons set forth below, the court grants defendants' motion to decertify the collective action and dismisses the claims of the opt-in plaintiffs.

In light of this ruling, defendants' motions for summary judgment with respect to each of the opt-in plaintiffs are moot and the court need only address defendants' motion for summary judgment with respect to plaintiff Gary A. Thiessen. As set forth in more detail below, the court grants defendants' motion for summary judgment as to plaintiff Gary A. Thiessen (doc. # 367).

### I. Procedural History

Much of the procedural history of this case is set forth in the court's order provisionally certifying this action as a collective action. *See Thiessen v. General Elec. Capital Corp.,* 996 F.Supp. 1071, 1072–73 (D.Kan.1998). Plaintiff Gary A. Thiessen filed his initial

complaint on September 23, 1996 alleging violations of the ADEA arising out of his employment with defendants.[1] During the summer of 1996, Mr. Thiessen sent notices to potential plaintiffs for purposes of proceeding as a collective action under § 216(b).[2] A total of thirty individuals elected to opt-in to the action and filed the requisite consent forms.

After engaging in three months of discovery both on the merits and on the issue of the appropriate composition of the proposed opt-in group, Mr. Thiessen moved the court to join the opt-in plaintiffs and to certify the action as a collective action under § 216(b). At that time, based on the record evidence before it, the court found that Mr. Thiessen had made a sufficient threshold showing that twenty-two opt-in plaintiffs were "similarly situated" to justify a provisional certification as a collective action under § 216(b).[3] The court cautioned, however, that it would further review the certification issue in connection with a timely filed motion for decertification after the close of all discovery on liability.

The court did not make a conclusive determination on the certification issue in light of certain deficiencies in the record. With respect to Mr. Thiessen's evidence, the court highlighted the lack of any significant showing by Mr. Thiessen that a specific causal link existed between the alleged blocker policy and the adverse job actions at issue in the case. With respect to defendants' evidence, the court found that the record lacked the requisite detail to support defendants' bare assertions that it would assert defenses specific to the numerous individualized claims of each opt-in plaintiff. Without such detail, the court was unable to adequately assess whether individualized defenses would predominate at trial. Finally, the court expressed a concern with coherently managing a trial of the action and presenting the evidence in a manner that would not confuse the jury or unduly prejudice any party.

In their papers filed in connection with defendants' motion to decertify, the parties have attempted to alleviate the concerns expressed by the court in its provisional certification order. The court has carefully considered the parties' papers in light of the specific deficiencies identified in its previous order and is prepared to rule. As set forth in more detail below, the court grants defendants' motion to decertify and dismisses the claims of the opt-in plaintiffs.

## II. Background

Although a brief overview of the factual context of this case is set forth in the court's order provisionally certifying this action as a collective action, see *Thiessen v. General Elec. Capital Corp.*, 996 F.Supp. 1071, 1072–73 (D.Kan.1998), some additional background information may be helpful in understanding the court's ruling today. Although the parties have provided the court with much detail about the alleged "blocker" policy, the court focuses here only on those facts relevant to the "similarly situated" analysis—whether a specific link exists between the blocker concept and the adverse employment actions at issue with respect to each of the opt-in plaintiffs and whether individual issues in the case will predominate at trial.

Defendants consist of several, related corporate entities: General Electric Capital Corporation (GECC); Monogram Retail Credit Services, Inc. (MCRSI), now known as Montgomery Ward Credit (MWC); and Retail Financial Services (RFS). The plaintiff group consists primarily of former and current employees of MWC. In March 1992, Dave Ekedahl (Vice President of RFS) and David Ferreira (Vice President of Human Resources for GECC) sent a memorandum to Steve Joyce (President and CEO of MWC) and Jeff Faucette (Vice President of Human Resources for MWC) regarding suggested topics for discussion during the upcoming

1. Mr. Thiessen also asserts two claims of discrimination based on his race.

2. The ADEA incorporates the procedures for enforcement of the Fair Labor Standards Act (FLSA). 29 U.S.C. § 626(b). A collective action under the ADEA is therefore governed by § 216(b) of the FLSA.

3. The court concluded, however, that eight opt-in plaintiffs were precluded from joining the provisionally certified collective action based on procedural grounds.

1992 Leadership Review. A "Leadership Review" is an annual meeting of senior staff (*i.e.*, those employees who reported directly to Steve Joyce) to assess MWC's business. The discussion topics for the 1992 Leadership Review included "What are plans to upgrade executive talent level ... remove blockers."[4] According to plaintiffs, the term "blocker" referred to well-performing older employees whom high-level management considered to be blocking the career paths of fast-track younger management employees (referred to as "high potential" employees or "hi-pots").

In connection with the 1993 Leadership Review, Faucette prepared a one-page overview of his vision of the blocker concept. The document, entitled "Band 4 Blockers,"[5] reads as follows:

- Out of 47 Band 4 Associates, 26 are "Blockers" (55%)[6]
- Almost all have satisfactory or better performance
- Potential actions
  — Re-look at early retirement options
  — Some positions can be eliminated through restructuring
  — Continue to move high potential MRCSI associates around the "blockers" and into RCFS jobs

According to plaintiffs, Steve Joyce discussed this document with his senior staff during the 1993 Leadership Review. In addition, in May 1993, Jeff Faucette distributed and discussed this document during MWC's annual HR meeting in Macon, Georgia. All of MWC's Human Resource managers were present. Although Faucette did not identify any specific "blockers" during this meeting, he asked the HR managers to submit names of possible blockers.

4. According to plaintiffs' evidence, the blocker concept originated as early as 1991, when the term "blockage" first appeared in an RFS internal memorandum. For purposes of assessing whether plaintiffs are similarly situated, however, the court need not analyze this dated material.

5. A "band" level refers to an employee's salary or grade level.

6. According to other documentary evidence, Plaintiffs Thiessen, Marsonette, DeMartine, Flow-

In June 1993, Faucette met with the Merriam, Kansas-based HR employees to discuss the blocker concept. The attendees at the meeting were Karen Macke, MWC's manager of compensation and benefits, and the human resources managers for the three major divisions in MWC—Jackie Wolf, collections department; Brenda Thomas, cardholder services; and Marsha Mondschein, national recovery. The agenda for the meeting was entitled "Reorganization Strategy—Potential 'Blockers.'"

During this meeting, Faucette distributed a list of individuals specifically identified as "possible blockers." According to defendants, this list constituted an analysis of early retirement options for selected individuals based on Faucette's perception of the performance and promotability of the listed individuals. The birth date of all individuals is included on the list and all individuals on the list were over the age of 40. Plaintiff Gary A. Thiessen and opt-in plaintiffs Robert DeMartine, Melva Heid, and Robert Marsonette appear on this list of "possible blockers." Opt-in plaintiff Gwen Colwell is listed on the same document in a separate category ("Over Age 55"). Opt-in plaintiffs James Lawson and Jim Flower appear on a separate handwritten list labeled "blockers."

During this June 1993 meeting, Faucette instructed the HR managers to make a note of the persons on the list within each of their respective divisions, meet with their respective operational managers, and discuss potential methods of "mov[ing] some of these blockers out."[7] In light of Faucette's request, each HR manager met with her respective operational manager to discuss the blocker concept: Brenda Thomas met with Rick Richards; Marsha Mondschein met with Mary Kinsey;[8] and Jackie Wolf met

er, Lawson and Heid are 6 of the 26 "blockers" referenced in this document.

7. According to defendants, the HR managers were instructed to discuss the feasibility of operating without the listed employees and potential methods of seeking the employees' agreement to retirement packages.

8. In November 1993, a presentation given by Kinsey indicates that "two blockers were separated" from the organization in 1993. According to plaintiffs, Kinsey made employment decisions with respect to Plaintiffs Osburn, Croy,

with Jerry Glover. The substance of these discussions, however, is the subject of much dispute and not relevant to the court's analysis.

According to plaintiffs, the blocker policy carried over into 1994. In support of this contention, plaintiffs highlight two 1994 Leadership Review charts which depict each employee's potential as measured against the employee's performance. According to these charts, an employee could be "meeting" or "exceeding" performance expectations and yet have "steady" potential rather than "high potential." Several of the plaintiffs are included in this category. Although these charts do not reference the employees' ages and do not mention the term "blocker," plaintiffs nonetheless maintain that these charts are further evidence of the blocker policy because, by definition, an employee who was meeting or exceeding expectations but considered "nonpromotable" was a "blocker."[9]

In January 1994, Steve Joyce left MWC to accept a promotion to the position of Vice President of Business Development for GECC. Joyce was succeeded as President and CEO of MWC by Gail Lanik, who was new to MWC. Moreover, Pat Friar, Senior Vice President of Human Resources for RFS, assumed human resources responsibility for MWC and became Faucette's superior. After noting a number of serious deficiencies in Faucette's performance, Lanik and Friar demoted Faucette to a lesser position, which was outside of MWC.

In the fall of 1994, in light of her view that the blocker concept had caused a "lack of cohesiveness in [the] organization," Lanik publicly repudiated the concept. In a series of meetings with MWC managers, Lanik stated that the blocker concept "was not the practice of GE nor my practice." Lanik also

stated that GE based its employment decisions "strictly on nondiscriminatory factors such as employees' qualifications and performance."[10]

Other than their bare allegations that each of the challenged employment decisions at issue here were based on the blocker policy or plaintiffs' "blocker" status, plaintiffs have set forth no evidence that the blocker policy or concept carried over into 1995.

## III. The "Similarly Situated" Analysis

The ADEA permits a plaintiff to proceed on behalf of himself or herself "and other employees similarly situated." 29 U.S.C. § 216(b); 29 U.S.C. § 626(b) (incorporating remedial and procedural provisions of the FLSA). In February 1998, the court concluded that, in light of plaintiffs' "blocker" evidence, the plaintiffs had made a sufficient threshold showing that they were "similarly situated" and provisionally certified the action as a collective action.[11] At that time, the court advised the parties that the final certification determination would focus primarily on three factors: (1) whether a sufficient link existed between the alleged blocker policy and the challenged employment decisions; (2) whether individual issues would predominate at trial; and (3) whether a trial of the action could be coherently managed and evidence presented in a manner that would not confuse the jury or unduly prejudice any party.

As set forth below, the court concludes that plaintiffs have failed to set forth sufficient evidence that a causal link exists between the alleged blocker policy or plaintiffs' "blocker" status and what occurred with respect to each plaintiff. Moreover, defendants have convinced the court that individu-

Shirey, Lawson and Thiessen. The significance of this purported "link" is discussed in footnote 19 of this opinion.

9. Contrary to plaintiff's assertion, the charts do not characterize any employee as "nonpromotable." Rather, the chart describes an employee's potential as "high potential," "evolving leader," or "steady."

10. A number of witnesses, including at least one of the plaintiffs, confirmed Lanik's repudiation of

the blocker concept. *See* Deposition of Plaintiff Flower, at 76 (Lanik said, "At this point the word 'blockers' is dead. There's no such thing. I don't want to hear it."). *See also* Deposition of Karen Macke, at 198 (Lanik told "all the managers how no program like that would exist under her presidency.").

11. A review of the applicable standards often utilized by courts in making the "similarly situated" determination is set forth in the court's earlier opinion. *See Thiessen v. General Elec. Capital Corp.*, 996 F.Supp. 1071, 1079–80 (D.Kan.1998).

al issues would predominate at trial. Finally, the court believes that a trial of this action would consist of highly detailed, voluminous evidence far beyond the limit of what a jury could reasonably be expected to absorb, retain and process. Accordingly, the court concludes that plaintiffs cannot be considered "similarly situated" for purposes of proceeding as a collective action and grants defendants' motion to decertify.

### A. The Blocker Policy

In its order provisionally certifying this action as a collective action, the court concluded that plaintiffs' "direct evidence of an overall policy of purported age discrimination" (i.e., the blocker lists and related documents) merited a threshold determination that the plaintiffs were similarly situated to Mr. Thiessen despite significant differences among the opt-in group. See Thiessen v. General Elec. Capital Corp., 996 F.Supp. 1071, 1081–83 (D.Kan.1998). The court forewarned plaintiffs, however, that final certification would require a "significant showing" of a specific link between defendants' alleged blocker policy and each of the adverse employment actions at issue in this case. Id. As set forth below, plaintiffs have not met their burden.

### 1. The Applicable Standard

■ Despite the court's explicit instruction that in order to survive a decertification motion plaintiffs would need to come forward with evidence of a nexus between the blocker

policy and what occurred with each plaintiff, and perhaps recognizing the tenuous nature of their "similarly situated" argument, plaintiffs insist that whether the blocker policy existed and whether each plaintiff was affected by the policy is properly resolved by the jury. According to plaintiffs, the role of the court is to determine only whether plaintiffs have set forth sufficient evidence to provide a "reasonable basis for crediting plaintiffs' assertions" that they are similarly situated.[12]

To the extent plaintiffs are suggesting that the court adhere to a standard akin to that utilized at the summary judgment stage, the court rejects plaintiffs' argument. The court is not merely required to assess, under an alleged "reasonable basis" standard, whether plaintiffs have created a submissible issue that they are similarly situated. Rather, the court makes a factual determination whether plaintiffs have carried their burden of proving that they are similarly situated. See Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir.1988) ("The decision whether to grant or deny certification of a class belongs within the discretion of the trial court.") (Rule 23 context);[13] Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1214 (5th Cir.1995) (on motion for decertification after discovery is largely complete, the court makes a factual determination on the similarly situated question); Bayles v. American Med. Response of Colorado, 950 F.Supp. 1053, 1067 (D.Colo.1996) (plaintiffs have the burden of showing that they are similarly situated).

12. In support of their argument that the court should apply a "reasonable basis" test in analyzing the "similarly situated" issue, plaintiffs direct the court to Hyman v. First Union Corp., 982 F.Supp. 1 (D.D.C.1997). To the extent the Hyman decision espouses the use of a summary judgment-type standard with respect to the "similarly situated" question, the court does not believe such a standard is appropriate at this late stage in the litigation process. Although the court may have been inclined to apply such a standard at the so-called "notice stage" of the certification process, plaintiffs did not seek certification at the notice stage. See Thiessen v. General Elec. Capital Corp., 996 F.Supp. 1071, 1072, 1080 (D.Kan.1998). Rather, plaintiffs sought certification only after thirty plaintiffs filed consent forms and the parties had engaged in considerable discovery. Id. Even then, the court utilized a fairly lenient standard in deciding to provisionally certify the action as a collective

action. Id. at 1080. It is far too late in the day, however, for plaintiffs to argue that they need only provide a "reasonable basis" for the court to believe they are similarly situated. See Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir.1988) ("It is neither practical nor prudential to engage the powerful machinery of a class action on the basis of a hypothetical. Crucial factors, such as economies of time, money, judicial resources, and the avoidance of multiple litigation, can remain wholly unsatisfied when certification occurs based on guesswork.").

13. Several courts have recognized that the various inquiries concerning a Rule 23 class, while not controlling, are instructive and lend useful guidance in considering the similarly situated requirement of § 216(b). See, e.g., Lusardi v. Xerox Corp., 118 F.R.D. 351, 359 n. 18 (D.N.J. 1987).

**1138**

In support of their proffered standard, plaintiffs suggest that the court, by requiring evidence of a link between the blocker policy and the employment decisions at issue, is improperly resolving the merits of plaintiffs' claims. *See Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.1988) (in making a class certification determination, the district court should avoid focusing on the merits underlying the class claim); *Anderson v. City of Albuquerque,* 690 F.2d 796, 799 (10th Cir. 1982) (reversing and remanding denial of class certification where district court noted its belief that plaintiff could not prevail on her individual claim). Contrary to plaintiffs' position, the court is not resolving the underlying merits of plaintiffs' claims. In requiring evidence of a link between the policy and the challenged employment actions, the court does not determine whether plaintiffs may individually state a cause of action or whether plaintiffs may ultimately prevail on the merits. Although the court has independently determined that Mr. Thiessen has not met his summary judgment burden on his individual claims, it may well be that other plaintiffs can state viable claims under the ADEA. Moreover, evidence with respect to the blocker policy or a plaintiff's blocker status may be relevant at the trial of an individual plaintiff's case. The court is simply determining whether the requirements of § 216(b) have been satisfied where, as here, plaintiffs concede that the only possible common thread among the plaintiff group is the existence of the blocker policy and adverse job actions which plaintiffs attribute, without more, to the application of the policy.

Plaintiffs also rely on the Tenth Circuit's opinion in *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248 (10th Cir.1992) in support of their argument that they need not establish the existence of any link between the blocker policy and the challenged employment decisions at issue. The *Whalen* decision, however, is distinguishable and, in any event, is consistent with the court's holding today. In *Whalen,* Unit Rig and Equipment Company ("URE") was sold to Terex Corporation. 974 F.2d at 1250. The newly acquired entity was named Unit Rig, Inc. ("URI"). *Id.* As part of the acquisition process, all URE employees (approximately 500 people) were discharged, and all but forty-six were hired by URI on

the following day without a formal job application process. *Id.*

Plaintiff John Whalen was among the forty-six employees not hired by URI. *Id.* He was sixty-three years old and had held the job of Controller at the time of his discharge. *Id.* The Controller hired after the acquisition was twenty-nine years old. *Id.* Shortly thereafter, Mr. Whalen filed suit under the ADEA. *Id.* Mr. Whalen's lawsuit went to trial and he received a jury verdict in his favor. *Id.* Evidence was introduced at trial that a Terex vice president, Larry Skaff, had requested lists of URE employees in declining order of age and that these lists were delivered to Mr. Skaff and the president of URI at the time these two men made employment decisions regarding URI. *Id.*

On appeal, defendants argued that Mr. Whalen failed to prove that age was a determining factor in defendants' actions and that their proffered reasons for the actions were pretextual. *Id.* at 1252. The Tenth Circuit rejected this argument and found that Mr. Skaff's request for employee lists in declining order of age (and the delivery of those lists) at the time Mr. Skaff and URI's president made the employment decisions, along with other evidence, was susceptible to the reasonable inference that Mr. Whalen's age was a determining factor in defendants' actions and that defendants' proffered explanations were pretextual. *Id.*

Plaintiffs contend that the *Whalen* case is significant (and analogous to this case) because the Tenth Circuit found that the employee lists could support an inference that age was a determining factor in defendants' actions toward Mr. Whalen despite the absence of any evidence of a specific link between defendants' failure to hire Mr. Whalen and any actual use of the employee list. Thus, according to plaintiffs, the "ultimate resolution of the nexus between defendants' discriminatory Blocker Policy and plaintiffs' claims is properly for the jury." *See id.* at 1253 ("Resolving the factual dispute over whether the lists were used for employment decisions would properly be a matter for the jury.").

Plaintiffs' reliance on the *Whalen* decision is misplaced for three reasons. First, the Tenth Circuit in *Whalen* simply held that an

employee list, in addition to other evidence admitted at trial, constituted sufficient evidence to sustain a verdict in favor of a single plaintiff. Here, the only issue for the court is whether these 23 plaintiffs are "similarly situated" for purposes of proceeding as a collective action when, by plaintiffs' own admission, the only possible common thread among them is defendants' alleged blocker policy. Second, contrary to plaintiffs' suggestion, the court is not requiring plaintiffs to "prove" the existence of a link between the blocker policy and what occurred with each plaintiff; rather, the court is merely requiring plaintiffs to show that they are indeed similarly situated (*i.e.,* by setting forth sufficient evidence to make a submissible case that a link existed). Finally, the very decisionmakers in *Whalen* requested and received the employee list *at the very time* the individuals were making the challenged employment actions. Here, the actionable adverse actions occurred years after the formulation of the blocker list, years after Faucette and Joyce left MWC, and long after Gail Lanik repudiated the blocker concept.[14] The mere fact that plaintiffs suffered adverse job actions after having been designated as "blockers," without more, simply does not support an inference that a causal connection existed between the blocker policy and the adverse actions, particularly in light of the passage of time and these intervening events. *Cf. Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) (unless the employer's adverse action "is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation"; four-month time lag between plaintiff's protected activity and his termination, without more, is insufficient to

justify an inference of causation); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (three-month period between plaintiffs' protected activity and her termination, standing alone, does not demonstrate a causal connection); *Redmond v. Day & Zimmerman, Inc.,* 897 F.Supp. 1380, 1386 (D.Kan. 1995) (no inference of causal connection where defendant terminated plaintiff's employment more than three years after plaintiff filed initial charge of discrimination) (citing *Burrus v. United Tel. Co.,* 683 F.2d 339, 343 (10th Cir.1982) (plaintiffs failed to establish prima facie case of retaliation where three years passed between the filing of her charges and her termination)), *aff'd,* 85 F.3d 641 (10th Cir.1996).

For the reasons set forth above, the court rejects plaintiffs' contention that they need not establish a link between the blocker policy and the challenged employment decisions here. As explicitly set forth in its previous order, the court will require plaintiffs to come forward with sufficient evidence that a causal link exists between defendants' blocker policy and each of the challenged employment actions. Without such evidence, the plaintiffs simply cannot be deemed "similarly situated" for purposes of proceeding as a collective action.

### 2. Plaintiffs' "Evidence" of a Causal Link

█ Despite their belief that the existence of a link between the blocker policy and the challenged employment actions is properly determined by the jury, plaintiffs urge that the following evidence establishes the requisite nexus: (1) Seven of the plaintiffs were specifically identified as "blockers" on various versions of the blocker lists;[15] (2) two of the plaintiffs were informed that they were "blockers";[16] and (3) the remaining plaintiffs

**14.** Some of the challenged employment decisions occurred closer in time to the introduction of the blocker policy and the creation of the blocker lists. These events, however, occurred well outside the 300–day filing window and, as such, are not actionable. See Section IV.C (no application of continuing violation theory where plaintiffs have failed to show application of blocker policy within 300–day filing period and policy was repudiated prior to 300–day filing window). Moreover, even if an inference of causation could be drawn with respect to these events, these events do not give rise to a further inference that adverse actions occurring within the 300–day filing

window were based on plaintiffs' blocker status or the blocker policy in light of the significant time lag and intervening events (*i.e.,* Faucette and Joyce left MWC in early 1994 and Lanik repudiated the blocker policy in the fall of 1994).

**15.** The seven plaintiffs whose names appear on the blocker lists are Plaintiffs Thiessen, Heid, Marsonette, Colwell, Lawson, Flower and DeMartine.

**16.** Plaintiffs Fries and Kaesberg were informed by defendants that they were "blockers."

"fit squarely within the definition of 'blockers.'" In addition, according to plaintiffs, each plaintiff suffered one of the potential actions set forth in defendants' blocker documents.[17] As set forth above, however, the mere fact that plaintiffs suffered adverse employment actions after having been designated as "blockers," standing alone, is insufficient to support an inference that a causal connection exists between the blocker policy and the adverse actions, particularly in light of the significant time lag and critical intervening events. See pp. 15–17 & n. 14.

Plaintiffs vigorously contend, however, that this "direct evidence" (*i.e.,* the blocker lists) has a "heavy duty evidentiary effect" sufficient to establish the requisite nexus. The court disagrees. Although the court recognized in its previous order that plaintiffs had come forward with "direct evidence *of an overall policy* of purported age discrimination," the blocker policy does not constitute direct evidence of discrimination with respect to each plaintiff. At best, the blocker policy is circumstantial evidence from which an inference of discrimination can be drawn if the requisite link is shown. *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1457 (10th Cir.1994) (no inference of pretext where plaintiff failed to connect memos outlining hidden policy of purported age discrimination "in any meaningful way" to her layoff). *Cf. Bolton v. Scrivner, Inc.,* 36 F.3d 939, 944 (10th Cir.1994) (comments by plaintiff's supervisor that plaintiff was an "old fart" does not show pretext because plaintiff failed to demonstrate a nexus between those comments and defendant's decision not to rehire him); *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994) (discriminatory statements are "insufficient to create a jury issue in an ADEA case" unless linked to relevant personnel action).

Plaintiffs also seek to establish a link between the blocker policy and each of the challenged actions by claiming that defendants' Human Resources personnel, who had been educated with respect to the blocker policy, were the persons responsible for the employment decisions at issue. This argument is unavailing. In support of their "cental decisionmaking" argument, plaintiffs direct the court to the 1994 Leadership Review charts depicting each employee's performance and potential. Although these charts were apparently prepared by defendants' HR employees, the charts fall far short of suggesting that these HR employees had any involvement in the specific, particularized employment actions taken with respect to these 23 plaintiffs.[18] Rather, the evidence establishes that operational managers, rather than Human Resources employees, made the personnel decisions challenged by plaintiffs here. The following examples, supported by affidavits and uncontroverted by plaintiffs, illustrate the tenuous nature of plaintiffs' "central decisionmaking" argument:

> Justin Boyle, Manager of the Las Vegas Regional collections Center, chose Carlos Gonzalez, Denise Trainor and Emily Love over Plaintiff Colwell for the 1993 Portfolio Control Manager positions.

> John Deets, Manager of Client Services, decided to rate Plaintiff DeMartine a "3" instead of a "2" on his 1997 performance appraisal.

> Werner Marschall, then Vice President of Business Information Systems, rated Plaintiff Flower a "3" instead of a "2" on his 1995 performance appraisal.

> Lisa Rometty, Client Services Manager for MWC, decided to place Plaintiff Grisham on a disciplinary action plan in 1996.

> Marc Sheinbaum, President and CEO of MWC, decided to eliminate the Chicago Systems Division, including Plaintiff Kaesberg's position with the Division, in 1997.

---

**17.** The potential actions as set forth in the "Band 4 Blockers" document, for example, include early retirement, elimination of position, and moving high potential MRCSI associates around the blockers.

**18.** Plaintiffs also suggest that these "performance and potential" charts, when coupled with the blocker lists, are sufficient to establish the requisite nexus between the policy and the ad-

verse actions. This argument, too, is unconvincing. On their face, the charts do not relate to any employment decisions, do not reference the age or birth dates of any employees, and do not mention the term "blocker." Although these charts may be relevant to analysis of an individual plaintiff's ADEA claim, the charts simply do not support a finding that these 23 plaintiffs are similarly situated for purposes of proceeding to trial as a collective action.

David Caldwell, Recovery Operations Manager in Lenexa at the time, decided to counsel Plaintiff Serra about disciplinary and performance issues in 1997.

Robert Mills, Senior Vice President of Retailer Financial Services Manufacturing, selected Bret Plymire, rather than Plaintiff Thiessen, for the Arlington/Grand Prairie RPC Manager position.

Bill Forget, Vice President of Production Services, decided not to hire Plaintiff Trice for the 1995 Senior Manager Remittance Processing position.

In the absence of sufficient evidence that these operational managers were simply carrying out orders from their respective HR managers, defendants' HR employees fail to provide the requisite nexus between the blocker policy and the adverse actions challenged by plaintiffs. Moreover, although Brenda Thomas, Marsha Mondschein and Jackie Wolf met with their respective client managers (Rick Richards, Mary Kinsey and Jerry Glover) shortly after the June 1993 "blocker" meeting with Faucette, plaintiffs have simply failed to show in any meaningful way that Richards, Kinsey or Glover applied the blocker policy with respect to any of the employment decisions at issue here.[19]

In sum, despite the court's forewarning, plaintiffs have failed to come forward with sufficient evidence of a causal link between the blocker policy or plaintiffs' purported blocker status and the challenged employment actions. Without such evidence, the court simply cannot conclude that the plaintiffs are similarly situated for purposes of proceeding as a collective action when, by their own admission, the blocker policy is the only possible connection among the plaintiff group. As such, the court grants defendants' motion to decertify and dismisses the claims of the opt-in plaintiffs.

### B. Individualized Defenses Asserted by Defendants

■ Not only have plaintiffs failed to establish a causal link between the blocker policy and the adverse employment actions at issue in this case, but defendants have convinced the court that individual issues would predominate at trial. Specifically, the court concludes that the numerous, particularized reasons set forth by defendants with respect to each of the challenged employment actions render collective treatment inappropriate. *See, e.g., Bayles v. American Med. Response of Colorado,* 950 F.Supp. 1053, 1067 (D.Colo. 1996) (decertifying collective action in FLSA context where the case was "fraught with questions requiring distinct proof as to individual plaintiffs" and defenses could not be addressed on a class-wide basis); *Brooks v. Bellsouth Telecommunications, Inc.,* 164 F.R.D. 561, 569 (N.D.Ala.1995) (denying certification in part because the "circumstances of employment termination are diverse" and the court "would be faced with numerous individualized defenses"), *aff'd,* 114 F.3d 1202 (11th Cir.1997); *Lusardi v. Xerox Corp.,* 118 F.R.D. 351, 370 (D.N.J.1987) (decertifying

---

**19.** In their statement of facts, plaintiffs vaguely suggest that the requisite link is established because Mary Kinsey, during a November 1993 presentation, referred to "two blockers" that were separated that year. It is clear that the "two blockers" reference does not relate to any of the plaintiffs in this action. Plaintiffs contend, however, that Kinsey was enlisted in the blocker program and was involved in employment decisions with respect to Plaintiffs Thiessen, Osburn, Croy, Shirey and Lawson. Although plaintiffs failed to cite to the record in support of this allegation, the court has reviewed the relevant summary judgment papers in an effort to discern the nature and extent of Kinsey's involvement in any employment decisions with respect to these individuals.

Based on the court's review, it appears that neither Plaintiff Shirey nor Plaintiff Lawson have asserted any claims based on any decisions made by Kinsey. Moreover, the claims asserted by Plaintiffs Thiessen, Osburn and Croy with respect to Kinsey's decisions occurred outside the 300–day filing window and, accordingly, are not actionable. See Section IV.C (no application of continuing violation theory where plaintiffs have failed to show application of blocker policy within 300–day filing peiod and policy was repudiated prior to 300–day filing period). Although the court has independently determined that Plaintiff Thiessen has not met his summary judgment burden, even if an inference of causation could be drawn with respect to Plaintiffs Croy and Osburn, such an inference is woefully inadequate to suggest that all 23 plaintiffs are similarly situated for purposes of proceeding to trial as a collective action. Plaintiffs have not suggested that the court consider whether Plaintiffs Croy and Osburn should proceed together as a subclass of "similarly situated" plaintiffs and, in the absence of such a request, the court declines to engage in this analysis.

collective action where the "attendant defenses would not provide for an efficient proceeding").

By way of example, the court considers the claims of the plaintiffs whose names appear on the blocker lists together with defendants' explanations for the challenged employment actions.[20] The following summaries plainly indicate the highly individualized nature of the defenses asserted by defendants:

*Opt-in Plaintiff Gwen Colwell:* Colwell claims, *inter alia,* that she was discriminatorily denied one of three Portfolio Control Manager positions in 1993 based on her age. According to defendants, Carlos Gonzalez, Denise Trainor and Emily Love were selected for the positions because MWC sought candidates with superior technical skills (possessed by Gonzalez); superior team building skills (possessed by Love); or a superior breadth of experience (possessed by Trainor, who had a college degree). Colwell, defendants maintain, was not well versed in the team building concept, had a narrow base of experience and did not have a college degree.

*Opt-in Plaintiff Robert DeMartine:* DeMartine alleges, *inter alia,* that defendants discriminatorily downgraded his 1996 performance evaluation based on his age. This evaluation was completed by DeMartine's manager, John Deets. According to Deets, DeMartine received a "3" on this evaluation instead of a "2" because of shortcomings in the areas of oversight and follow-through that resulted in, for example, a "stalled" new audit performance project. In addition, according to Deets, DeMartine failed to develop strategies to maximize MWC's auditing abilities, to develop creative incentives for agencies' performance, and to proactively develop solutions to improve overall performance.

*Opt-in Plaintiff James Flower:* Flower alleges, *inter alia,* that he was discriminatorily laid off in 1997 based on his age. According to defendants, Flower was laid off when MWC eliminated its Chicago Systems group, including Flower's position in that group. The decision to eliminate the Chicago Systems group was made by Marc Sheinbaum, the current President and CEO of MWC. Sheinbaum averred that this group was eliminated because the group's work often duplicated the capabilities available in other locations and because the installation of better systems (such as the creation of a readily accessible data warehouse for customer information) rendered a portion of the *ad hoc* responsibilities performed by the Chicago Systems group obsolete.

*Opt-in Plaintiff Melva Heid:* Heid claims, *inter alia,* that she was discriminatorily denied the Las Vegas Human Resources Manager position in 1995 based on her age. According to Marc Lopez, one of the decisionmakers involved in filling the position, the successful candidate had significant and recent HR experience, solid interpersonal skills, and a proven ability to handle difficult employee situations. Lopez believed that Heid's HR experience was outdated (she had not been employed in a HR capacity since 1989), that she had difficulty relating with employees at all levels of the organization, that her management style was "rigid and inflexible," and that she was not "approachable."

*Opt-in Plaintiff Robert Marsonette:* Marsonette alleges, *inter alia,* that he was discriminatorily denied the Merriam Collection Process Manager position in 1995 because of his age. According to defendants, Marsonette was not selected for the position because of his "well-documented history of ineffective management and interpersonal relationships" and his limited educational background. In support of their position, defendants cite an incident in 1995 in which one of Marsonette's subordinates filed a sexual harassment complaint against him. As a result, Marsonette was counseled with respect to his "inappropriate and abrasive interpersonal style." This incident, according to defen-

---

**20.** In setting forth these examples, the court focuses only on defendants' proffered nondiscriminatory reasons in an effort to illustrate the highly individualized defenses and particularized reasons for the challenged actions. In doing so, the court expresses no opinion on the merits of the proffered reasons and does not address other defenses raised by the defendants (*e.g.,* waiver issues, procedural bars, etc.).

dants, further disqualified Marsonette for the Collection Process Manager position. *Plaintiff Gary A. Thiessen:* Thiessen claims, *inter alia,* that he was discriminatorily denied the Arlington/Grand Prairie Remittance Processing Manager position in 1995 because of his age. According to defendants, Thiessen did not receive the position because he did not apply for it and because he lacked experience with sophisticated imaging technology. The successful candidate, Bret Plymire, had obtained experience with imaging technology prior to coming to MWC.

The foregoing examples are a mere prelude to what would most likely prove to be 23 individual jury trials to determine defendants' liability to each plaintiff. To proceed in a collective action with the defenses and circumstances surrounding each of the 23 plaintiffs and their respective claims is to defeat the purposes of a collective action. *See Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) (identifying one benefit of a collective action as "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity."). *See also Bayles,* 950 F.Supp. at 1067 ("[G]iven the number of individual issues that must be resolved, I am not persuaded that a single trial would save significant time or effort."). Simply put, consolidation of these claims into a collective action with the underlying defenses would not provide for an efficient proceeding for the resolution of what appears to be 23 distinct cases.

It may be argued that there is a common thread concerning the claims of each individual plaintiff (*i.e.,* the blocker policy) and, thus, collective treatment would avoid some repetition of evidence and argument. Despite the potential benefits of proceeding as a collective action, however, plaintiffs still must meet their burden of showing that they are similarly situated. In light of the defenses and unique circumstances surrounding each plaintiff and his or her claims, plaintiffs have not met this burden. Of course, this is particularly true because the plaintiffs have failed to come forward with sufficient evidence demonstrating a causal link between their individual claims and the blocker policy. In any event, the judicial inefficiencies described above clearly outweigh any potential benefits in proceeding as a collective action.

For the foregoing reasons, the court is convinced that individual issues would predominate at a trial of this action. Accordingly, bearing in mind the purposes of a collective action, the court determines that plaintiffs are not similarly situated within the meaning of § 216(b) and grants defendants' motion to decertify.

### C. Trial Management Considerations

At the pretrial conference, following up on concerns set forth in its previous order with respect to trial management issues, the court requested that plaintiffs submit a proposed trial management plan in connection with their papers in opposition to defendants' motion to decertify and that defendants then respond to plaintiffs' plan. According to plaintiffs' recommendation, Phase One of the trial would submit the pattern and practice allegations as well as the individual claims and damages of nine plaintiffs.[21] Specifically, plaintiffs suggest that

> [t]his trial will involve a determination of common class issues relating to the existence, implementation, and discriminatory nature of the Blocker Policy as well as class issues regarding wilfulness under the ADEA. In addition, because Defendants specifically identified these Plaintiffs as "blockers" in writing, or verbally, this phase of trial will also involve presentation of common evidence that each of these Plaintiffs were, in fact, designated and/or treated as "Blockers" by Defendants. Finally, this phase will involve a determination of the few easily manageable individual issues, including causation and damages, on the submissible claims of these nine Plaintiffs. The Parties should be able to try this Phase of the trial to a jury in two (2) weeks, plus a day or two.

If the jury determined that the blocker policy existed and that defendants had engaged in a pattern and practice of age discrimination,

---

21. Plaintiffs suggest that the seven plaintiffs whose names appear on various versions of the blocker lists, as well as the two plaintiffs who were told that they had been designated as "blockers," be tried together.

according to plaintiffs' proposed plan, then the same jury would then hear Phase Two of the trial, which would involve the remaining 14 plaintiffs.

The court agrees with defendants that plaintiffs' proposed trial management plan has numerous, serious deficiencies. In light of its determination, however, that the plaintiffs are not similarly situated for purposes of proceeding to trial as a collective action, the court need not address this issue at length. Suffice it to say, plaintiffs' plan renders individualized consideration of the claims impossible and imposes extraordinary burdens on the jury, both in terms of the quantity of evidence and the length of trial.[22] In the end, the only viable and appropriate solution may well have been single-plaintiff trials, thereby defeating one of the benefits of proceeding as a collective action. In any event, the absence of any workable trial management plan only reinforces the court's decision to decertify this action.[23]

## IV. Defendants' Motion for Summary Judgment with respect to Mr. Thiessen's Individual Claims

Mr. Thiessen claims that defendants discriminated against him on the basis of his age and race in violation of the ADEA and Title VII. Specifically, Mr. Thiessen alleges that defendants failed to promote him on three separate occasions because of his age; phased him out of another position because of his age and race; and downgraded his performance reviews because of his age and race. Defendants move for summary judgment on each of Mr. Thiessen's claims. As set forth in more detail below, defendants' motion for summary judgment is granted.

## A. Additional Facts Relevant to Mr. Thiessen's Claims

A brief review of Mr. Thiessen's employment history with defendants may be helpful.

Plaintiff Gary A. Thiessen began his employment with Montgomery Ward in 1968 as a Credit Manager Trainee. From 1972 to 1987, Mr. Thiessen was employed as a Walnut Creek New Account Supervisor; Collections Supervisor; and ultimately a Collection Manager. In 1987, Mr. Thiessen was promoted to Group Collection Manager and became a Band IV employee. Two years later, Mr. Thiessen was employed as a Walnut Creek Group Collections Manager; an Interim Business Center Manager; and a Grand Prairie Co–Business Center Manager. From March 1990 to July 1991, he held the position of Chicago Remittance Processing Center Manager.

In July 1991, Mr. Thiessen transferred to Hampton, Virginia to assist with the completion of the Hampton Recovery Unit construction. Soon thereafter, Mr. Thiessen assumed the Band IV position of National Attorney–Agency Manager, based out of Hampton. In this position, Mr. Thiessen reported to the Vice President of Recovery, who was initially Mike Case and then Mary Kinsey. In March 1993, Mary Kinsey told Mr. Thiessen that she wanted to "phase him out" of his National Attorney–Agency Manager position and groom Carlton Benton into the position. Mr. Benton was a younger, African–American employee. Ms. Kinsey indicated that she would like to phase Mr. Thiessen into a special projects position.

In January or February of 1994, Mr. Thiessen learned that the Hampton location was closing and relocating to Lenexa, Kansas. Mary Kinsey asked him to help with the relocation effort. When Mr. Thiessen asked whether he would get his old position back upon the completion of the Lenexa facility, Ms. Kinsey responded, "We'll see." Accordingly, in May 1994, Mr. Thiessen relocated to Kansas to oversee the build-out of the Lenexa facility.[24]

---

**22.** Plaintiffs' estimate that Phase One would involve "a few easily manageable individual issues" and could be tried in two weeks is unrealistic in the court's experience.

**23.** Defendants also maintain that various conflicts among members of the plaintiff group constitute a fourth reason for decertifying the action. *See Thiessen v. General Elec. Capital Corp.,* 996

F.Supp. 1071, at 1081 n. 16 (D.Kan.1998). Plaintiffs have not addressed this issue in their opposition papers. The court, however, declines to address this issue in light of its decision to decertify the action for independent reasons.

**24.** Carlton Benton assumed Mr. Thiessen's duties as National Attorney–Agency Manager when Mr. Thiessen moved to Lenexa and eventually assumed the position itself.

In mid–1995, after the completion of the Hampton relocation effort, Joan Makura approached Mr. Thiessen and asked him to assist with the construction of a new remittance processing facility in Addison, Illinois, a suburb of Chicago. Ms. Makura believed that Mr. Thiessen had done a good job in Lenexa and felt that he would do well in Chicago. According to Mr. Thiessen, the Chicago project was a demotion in that Mr. Thiessen's earning and promotability potential were diminished. Nonetheless, Mr. Thiessen agreed to assist with the project. This assignment ended in or about December 1995.

From January to August 1996, Mr. Thiessen assisted with the construction of defendants' new Atlanta facility. At the completion of the project, Mr. Thiessen transferred to defendants' Las Vegas facility and assumed his present Band IV Collection Manager position. In his papers, however, Mr. Thiessen asserts that his position will be eliminated as of May 30, 1998 and that he is not allowed to post for any other positions within GE.

Mr. Thiessen filed his charge of discrimination with the EEOC on February 6, 1996 and his initial complaint on September 23, 1996. In both his EEOC charge and his complaint, Mr. Thiessen alleges that he has suffered age discrimination and/or race discrimination in connection with the employment actions described below. Specifically, Mr. Thiessen alleges that he was (1) denied the Las Vegas Business Center Manager position in 1993 because of his age; (2) "phased out" of his position as National Attorney–Agency Manager in 1994 because of his age and race; (3) downgraded on his 1993 and 1994 performance reviews because of his age and race; and (4) denied two Remittance Processing Manager positions in 1995 be- cause of his age.[25] Mr. Thiessen is Caucasian and fifty-one years old.

### The 1993 Las Vegas Business Center Manager Position

In September 1993, defendant MWC posted the Las Vegas Business Center Manager position at MWC's Las Vegas facility. The job posting indicated a preference for candidates with a four-year college degree. The job posting also emphasized strategic skills and listed one of the position responsibilities as "provid[ing] strategic leadership in the design and implementation of the start-up center." Mr. Thiessen and Justin Boyle were among the candidates for the position. Jerry Glover, the individual responsible for filling the position, averred that Mr. Boyle was the most qualified candidate for the position. He based this conclusion on Mr. Boyle's educational accomplishments,[26] prior work experience, band level, broad-based strategic knowledge, and strategic and technical abilities. Moreover, Mr. Glover averred that he had supervised Mr. Thiessen in previous years and found Mr. Thiessen's experience ill-suited to the demands of the Las Vegas Business Center Manager position. Ultimately, Jerry Glover selected Justin Boyle for the position.[27]

### Phase–Out of National Attorney–Agency Manager Position

In July 1991, Mr. Thiessen assumed the position of National Attorney–Agency Manager and, during the relevant time period, reported to Mary Kinsey, the Vice President of Recovery. In March 1993, Mary Kinsey told Mr. Thiessen that she wanted to "phase him out" of his National Attorney–Agency Manager position and groom Carlton Benton into the position. Mr. Benton was a younger, African–American employee. Ms. Kinsey indicated that she would like to phase

---

**25.** Initially, Mr. Thiessen also claimed that he was denied a Vice President of Recovery position based on his age and that defendants discriminatorily altered one of his performance appraisals and delayed its delivery to him in retaliation for his filing an EEOC charge. In his papers, Mr. Thiessen expressly abandoned his claim with respect to the Vice President of Recovery position. Moreover, Mr. Thiessen failed to address the merits of his "altered appraisal" claim. Thus, the court grants defendants' motion for summary judgment with respect to these claims.

**26.** Mr. Boyle had a college degree and an MBA in finance. Mr. Thiessen did not have a college degree.

**27.** In his papers, Mr. Thiessen provides great detail about his qualifications for the Las Vegas Business Center Manager position. The court has omitted many of these facts in light of its determination that Mr. Thiessen's claim with respect to this position is time-barred.

Mr. Thiessen into a special projects position.[28]

In the first quarter of 1994, it was announced that defendants would relocate and consolidate the Hampton Recovery unit with its Kansas operation. This relocation and consolidation was designed to improve client service and marketing efforts, reduce costs, and minimize duplicative operations and assignments. Mary Kinsey asked Mr. Thiessen to help with the relocation effort.[29] Mr. Thiessen responded that "if that's what I can do to help, yes." When Mr. Thiessen asked whether he would get his old position back upon the completion of the Lenexa facility, Ms. Kinsey responded, "We'll see." Accordingly, Mr. Thiessen relocated to Kansas in May 1994 in order to build out the Lenexa facility and assist with various special projects associated with the Hampton relocation. Mr. Thiessen experienced no decrease in salary or band level as a result of this assignment. In fact, Mr. Thiessen received a $15,000 bonus for his efforts in 1994 and he was nominated for several awards.

During the time that Mr. Thiessen was in Kansas, Carlton Benton remained in Hampton and assumed acting responsibility for Mr. Thiessen's attorney-agency manager duties. Although Mr. Benton was supposed to report to Mr. Thiessen during this time, he apparently reported directly to Mary Kinsey. In September 1994, without notice to Mr. Thiessen, Mr. Benton took over Mr. Thiessen's position as National Agency–Attorney Manager.

*Improper Downgrading of Performance*

Throughout his employment with defendants, Mr. Thiessen (like all defendants' employees) periodically received performance evaluations. Mary Kinsey completed Mr. Thiessen's 1993 and 1994 performance appraisals. Various criticisms of Mr. Thiessen's performance are made in these evaluations. According to the appraisals, however, Mr. Thiessen's overall performance for 1993 and 1994 met expectations.

*The 1995 RPC Manager Positions*

In June 1995, defendant MWC posted two Remittance Processing Center (RPC) Manager positions. One of these positions was located at defendants' Arlington/Grand Prairie facility. The other position was for a start-up facility to be located in Addison, Illinois. Although not specifically mentioned in the posting, these positions required the ability to utilize sophisticated imaging technology. The job postings indicated a preference for candidates with an MBA degree and listed two of the positions' responsibilities as "develop, plan, and direct operation strategies," and "work to continually improve process, proactively set operational strategy, and position unit for growth."

Robert Mills was the manager to whom both of the RPC managers would report. Mr. Mills participated in both the interview process and the hiring decisions for both positions. According to Mr. Mills' affidavit, Mr. Thiessen was not interviewed for either position because he lacked the abilities and skills to successfully manage either site.[30] Specifically, Mr. Mills averred that Mr. Thiessen lacked imaging technology experience as well as remittance processing experience in an imaging environment.

Bret Plymire was selected for the Arlington/Grand Prairie RPC Manager position. Mr. Plymire had a college degree and approximately 10 years of remittance processing management experience, during the last several of which he managed a site utilizing imaging technology. Steve Pollack was selected for the Addison RPC Manager position. Mr. Pollack possessed a college degree in marketing and an MBA in finance. More-

---

**28.** In this same time frame, Mr. Thiessen had a conversation with Mary Kinsey's husband, Chris Kinsey. Mr. Kinsey, who was also employed by defendants, told Mr. Thiessen that "once you get special projects, that's the kiss of death."

**29.** Mr. Thiessen believed that his performance overseeing the build-out of defendants' Hampton facility prompted Ms. *Kinsey* to utilize him for the Lenexa project.

**30.** Defendants maintain that Mr. Thiessen failed to apply for the Arlington/Grand Prairie position and failed to apply timely for the Addison position. Although Mr. Thiessen concedes that he did not submit a formal application for either position, he maintains that Robert Mills had sufficient and specific notice of his desire for such a position via a letter that Mr. Thiessen had sent to him in April 1995.

over, Mr. Pollack had several years of remittance processing experience including recent experience with image payment processing.[31] Unlike the successful candidates, Mr. Thiessen did not have a college degree, had only eighteen months of remittance processing experience and did not have imaging processing experience.

## B. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party that also bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 536 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## C. Procedural Considerations

Defendants move for summary judgment on three of Mr. Thiessen's claims (*i.e.*, his 1993 failure-to-promote claim; his

"phase-out" claim; and his downgraded performance claim) on the grounds that these claims are time-barred. Specifically, defendants contend that the alleged discriminatory acts underlying these claims occurred well outside the limitations period. In response, Mr. Thiessen maintains that these claims are sufficiently related to events occurring within the time limitations period and, thus, constitute a "continuing course of conduct." As set forth in more detail below, the court concludes that an application of the continuing violation theory is not appropriate in this case. Thus, Mr. Thiessen's claims that he was (1) denied the 1993 Las Vegas Business Center Manager position based on his age; (2) "phased out" of his National Attorney–Agency Manager position based on his age and race; and (3) downgraded on his performance evaluations based on his age and race are time-barred. As such, the court grants defendants' motion for summary judgment with respect to these claims.

In a deferral state like Kansas, a plaintiff asserting a claim under the ADEA or Title VII must file an administrative charge within 300 days after the alleged discriminatory act occurred. *See* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e–5(e)(1). This filing is a prerequisite to a civil suit under Title VII and the ADEA. *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (Title VII); *Bruno v. Western Elec. Co.*, 829 F.2d 957, 960 (10th Cir.1987) (ADEA). Mr. Thiessen filed his administrative charge on February 6, 1996. Thus, according to defendants, only those claims arising after April 11, 1995 (300 days prior to the filing of Mr. Thiessen's charge) are properly considered by the court. Mr. Thiessen may recover for discriminatory acts occurring prior to the statutory limitations period, however, if at least one instance of the discriminatory practice occurs within the filing period and the earlier acts are "part of a continuing policy or practice that includes the act or acts within the statutory period." *See Mascheroni v. Board of Regents*, 28 F.3d 1554, 1561 (10th Cir.1994) (quoting *Nannie & the Newborns*, 3 F.3d at 1415).

---

**31.** According to Mr. Thiessen, however, the learning curve associated with imaging technology was very short. Moreover, Mr. Pollack needed an additional 30 days of training on imaging technology. Thus, Mr. Thiessen believes that he would have been able to achieve the same degree of proficiency with respect to imaging technology as Mr. Pollack.

Under the continuing violation theory, a plaintiff has satisfied the filing requirements when he or she shows a continuing policy and practice that operated within the statutory filing period. *Bruno*, 829 F.2d at 960. When the policy and practice is company-wide, the plaintiff can show that a violation occurred within the statutory period by showing some application of the policy within that period. *Id.* at 961 (citing *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1543 (10th Cir.1987)). If, however, the defendant can show that the policy was discontinued before the limitations period, then the plaintiff's claim must be dismissed as a matter of law. *Id.*

Mr. Thiessen has not produced sufficient evidence for a reasonable factfinder to conclude that an application of the policy occurred within the limitations period. The only specific alleged discriminatory acts that occurred within the limitations period are the denial of the Addison RPC Manager position and the denial of the Arlington/Grand Prairie RPC Manager position. With respect to both of these positions, Robert Mills determined that other individuals were more qualified than Mr. Thiessen for the positions. Mr. Mills averred that he had never been asked to implement any so-called "blocker policy," and that he had never taken any adverse employment action pursuant to any so-called "blocker policy" or concept. Furthermore, there is no evidence in the record that Mr. Mills attended any of the meetings during which the blocker policy was discussed or that Mr. Mills had any knowledge of Mr. Thiessen's "blocker" status.

Moreover, the record reveals that the alleged blocker policy was discontinued prior to the start of the limitations period. Specifically, it is uncontroverted that Steve Joyce and Jeff Faucette, the individuals who launched the blocker concept in the early 1990's, were not even employed by defendant MWC at the start of the limitations period. In addition, Gail Lanik, defendant MWC's president and CEO, publicly repudiated the blocker concept in the fall of 1994.[32] Even Mr. Thiessen's chronology of events with respect to the blocker policy culminates in 1994. *See* Plaintiff's Brief in Opposition at pp. 31–34.

Finally, the Tenth Circuit has cautioned that the "continuing violation doctrine is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Nannie & the Newborns*, 3 F.3d at 1415 n. 6. Consistent with this principle, the Circuit has restricted the operation of the continuing violation doctrine "to those situations underscored by its equitable foundation." *Id.* In other words, "if an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine." *Id.*

Significantly, Mr. Thiessen admitted that he first heard about the blocker list in late 1993 or early 1994 and, in fact, even heard that his name was on the blocker list.[33] Mr. Thiessen's knowledge of the alleged blocker list, even if he was uncertain whether the list actually existed or whether his name appeared on the list, should have alerted him of the possibility that his rights were violated when he was denied the Las Vegas Business Center Manager position in 1993, phased out of the National Attorney–Agency Manager position in 1994, and downgraded on his performance evaluations in both years. *See Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557–58 (10th Cir.1994) (rejecting plaintiffs' equitable tolling argument that their ADEA causes of action did not accrue when they were given the challenged demotions and transfers, but only when their suspicions of age discrimination were aroused by watching a television program, "A Current Affair.").

---

**32.** Mr. Thiessen makes a passing effort to controvert Lanik's repudiation of the blocker concept. Specifically, Mr. Thiessen cites to the affidavit of Rick Richards, a former employee of defendants. According to Richards, he received an unexpected telephone call from Lanik in May 1994 who informed him that she had "exciting news"—she had prepared her organizational chart and Richards was not on it. Lanik then advised Richards that he had three days to accept an early retirement package. This isolated example, without any factual context, simply does not suggest that Lanik did not repudiate the blocker concept in the fall of 1994.

**33.** Mr. Thiessen testified that he "dismissed" the report that his name was on the blocker list because he had not actually seen the list.

In sum, the court concludes that Mr. Thiessen has failed to set forth sufficient facts to raise a triable issue on whether defendants engaged in a continuing course of discrimination such that the court should consider the incidents that occurred prior to the 300–day filing limitations period. Accordingly, the court grants defendants' motion for summary judgment with respect to Mr. Thiessen's 1993 failure-to-promote claim, "phase out" claim, and downgraded performance claim.

## D. Substantive Considerations

■ Having determined that three of Mr. Thiessen's claims are time-barred, the court addresses whether Mr. Thiessen has met his burden on summary judgment with respect to his remaining claims—the denial of two RPC manager positions in 1995. Mr. Thiessen contends that defendants denied him these positions on the basis of his age. As set forth in more detail below, the court concludes that Mr. Thiessen has failed to produce evidence from which a reasonable factfinder could conclude that defendants' proffered explanations for its actions were "unworthy of credence." Thus, the court grants summary judgment in favor of defendants' on Mr. Thiessen's remaining age discrimination claims.

The court analyzes Mr. Thiessen's claims under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 327 (10th Cir.1996). In the summary judgment context, plaintiff initially must raise a genuine issue of material fact on each element of his prima facie case of discrimination. *See id.* Once plaintiff establishes his prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *Id.* (citing *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)). If the defendant comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff "to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (quoting *Randle*, 69 F.3d at 451). If the plaintiff proffers such evidence, the motion for summary judgment must be denied. *Id.* (quoting *Randle*, 69 F.3d at 452 n. 17).

■ To establish a prima facie case in the failure-to-promote context, Mr. Thiessen must show "that there were promotional opportunities available that were filled by [younger persons], that [he] was qualified for promotion, and that despite [his] qualifications [he] was not promoted." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1362 (10th Cir.1997) (Title VII). According to defendants, Mr. Thiessen cannot establish a prima facie case, at least with respect to the Arlington/Grand Prairie position, because he admits that he did not apply for the position. *See Bauer v. Bailar*, 647 F.2d 1037, 1044 (10th Cir.1981) (plaintiff "must prove that she applied for an available position for which she was qualified" in order to establish prima facie case) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Montgomery v. Card*, 794 F.Supp. 1066, 1067 (D.Kan.1992) (same). As Mr. Thiessen points out, however, the "law does not require that a plaintiff formally apply for the job in question." *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1251 (10th Cir.1992). Rather, "the law requires either that the employer be on specific notice that the plaintiff seeks employment or, where informal hiring procedures are used, that the plaintiff be in the group of people who might reasonably be interested in the particular job." *Id.* (citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir.1984); *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1017 (2d Cir.1980)).

In April 1995, Mr. Thiessen sent a memorandum to Robert Mills regarding "RPC—Chicago" in which he expressly stated that "he would like to be considered as a candidate to manage the new facility in Chicago." Although Mr. Thiessen may have been referring to the new Addison facility, a reasonable jury could conclude that Mr. Mills, the individual responsible for filling the Arlington/Grand Prairie position, had specific notice that Mr. Thiessen was interested in the Arlington/Grand Prairie position. This is particularly true in that Mr. Thiessen sent the memorandum just weeks before defendants posted the Arlington/Grand Prairie po-

sition. Thus, the court concludes that Mr. Thiessen has adequately established his prima facie case of age discrimination.[34]

Nonetheless, Mr. Thiessen has failed to raise any inference of pretext. Defendants have come forward with legitimate, nondiscriminatory reasons for selecting other candidates for the positions. According to defendants, Bret Plymire was selected for the Arlington/Grand Prairie position because he had a college degree and 10 years of remittance processing management experience, during the last several of which he managed a site utilizing sophisticated imaging technology. Similarly, according to defendants, Steve Pollack was selected for the Addison position because he had a college degree in marketing, an MBA in finance, several years of remittance processing experience, and recent experience with image payment processing technology. Mr. Thiessen, on the other hand, did not have a college degree and had managed a remittance processing center for only 18 months. Moreover, according to defendants, Mr. Thiessen lacked imaging technology experience.

In an effort to show that defendants' proffered reasons are pretextual, Mr. Thiessen first asserts that he was more qualified than the individuals selected for the positions. He maintains, for example, that he had many years of management experience with specific experience in remittance processing. He also argues that the "learning curve" associated with imaging technology was very short, apparently suggesting that his lack of experience with imaging technology should not have been a factor in defendants' decision.[35] Finally, Mr. Thiessen points out that Steve Pollack, the individual selected for the Addison position, needed an additional 30 days of training with respect to imaging technology. According to Mr. Thiessen, he could have taken the same training and achieved the same degree of proficiency with imaging technology.[36]

34. Apparently, Mr. Thiessen did not formally apply for the Arlington/Grand Prairie position because he was not aware that the position had been posted. At the time defendants posted the position, Mr. Thiessen was traveling for defendants and did not have access to a laptop computer. According to Mr. Thiessen, his repeated requests for a laptop computer, which would have allowed him to stay updated on the electronic job postings, were denied.

35. Mr. Thiessen also argues that imaging technology experience was not listed as a requirement in the position posting. In some circumstances, an employer's use of selection criteria not previously disclosed to the applicant may give rise to an inference of pretext. See, e.g., Corneveaux v. Cuna Mut. Ins. Group, 76 F.3d 1498, 1503 (10th Cir.1996) (defendant's claim that plaintiff was not qualified for position because she did not possess sales experience or a sales license was sufficient to give rise to inference of pretext where there was no indication of the need for a sale license in anything previously told to her, in the job description, or in any company policy; employer hired someone for same position six months earlier who did not have sales license; and plaintiff showed that the position itself did not involve sales). See also Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir.1995) (defendant's claim that plaintiff was not qualified for the position because she lacked an Associate's degree sufficient to give rise to inference of pretext where requirement was not a genuine prerequisite for the position). Significantly, however, Mr. Thiessen concedes in his deposition that imaging technology was in fact utilized in the position and it is uncontroverted that the successful candidate possessed such experience.

36. Mr. Thiessen also suggests in his response to defendants' statement of uncontroverted facts that defendants' reliance on Mr. Pollack and Mr. Plymire's educational background (and, by implication, Mr. Thiessen's lack of a college degree) is a pretext for discrimination because the positions did not require an advanced degree; rather, the job postings merely expressed a preference for advanced degrees. The Tenth Circuit, however, has recognized that an employer's reliance on superior educational credentials in making employment decisions does not give rise to an inference of pretext. See Rea v. Martin Marietta Corp., 29 F.3d 1450, 1458 (10th cir.1994) (no inference that defendant's proffered reasons for selecting plaintiff for layoff were pretextual where lower-ranking younger employee possessed college degree and plaintiff did not) (citing Barnes v. GenCorp Inc., 896 F.2d 1457, 1471 (6th Cir.1990) (employer entitled to rely on superior educational credentials in retaining more qualified younger employee over older employee with more seniority)). Of course, in certain circumstances not present here, an employer's purported reliance on educational credentials may give rise to an inference of pretext. See, e.g., Randle v. City of Aurora, 69 F.3d 441, 453–54 (10th Cir.1995) (defendant's claim that plaintiff was not qualified for position because she did not possess Associate's degree was sufficient to give rise to inference of pretext where defendant had both previously and subsequently treated the requirement as unnecessary).

These assertions, however, are insufficient to create an inference that defendants' reasons for selecting Mr. Thiessen for the positions were a pretext for age discrimination. *See Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 747 (10th Cir.1991) (plaintiff's assertions that he was a better qualified geologist than younger geologists retained during RIF does not permit conclusion that defendant's evaluation of plaintiff's performance or qualifications was a pretext for age discrimination); *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988) (plaintiff's assertions that she was in fact equally or more qualified than the individuals retained during RIF insufficient to support finding of pretext in age discrimination case). Mr. Thiessen's own perceptions with respect to his qualifications for the positions are irrelevant; rather, it is the perception of the decisionmaker which is relevant. *See Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 988 (10th Cir.1996) ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.") (citing *Branson,* 853 F.2d at 772 (citing *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980))).[37] Robert Mills, a key decisionmaker with respect to both the Arlington/Grand Prairie position and the Addison position, perceived Mr. Thiessen as less qualified than other candidates. Specifically, Mr. Mills averred that Mr. Thiessen was not interviewed for either position because he lacked the abilities and skills to successfully manage either site (*e.g.,* he lacked imaging technology experience, remittance processing experience in an imaging environment, and a college degree). In such circumstances, Mr. Thiessen's assertions that he was more qualified than the successful candidates, without more, are insufficient to create an inference that defendants' proffered reasons for not selecting Mr. Thiessen for either position are pretextual.

Mr. Thiessen's only other "pretext" evidence is that he was listed by defendants as a "blocker" and, thus, was specifically identified as someone who was blocking the advancement of younger "high potential" employees, including Bret Plymire and Steve Pollack.[38] This evidence, however, is insufficient to demonstrate pretext because Mr. Thiessen has failed to demonstrate any connection between his "blocker" status and defendants' decision to select other candidates for the RPC Manager positions. *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1457 (10th Cir.1994) (no inference of pretext where plaintiff failed to connect memos outlining hidden policy of purported age discrimination "in any meaningful way" to her layoff). *Cf. Bolton v. Scrivner, Inc.,* 36 F.3d 939, 944 (10th Cir.1994) (comments by plaintiff's supervisor that plaintiff was an "old fart" does not show pretext because plaintiff failed to demonstrate a nexus between those comments and defendant's decision not to rehire him); *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994) (discriminatory statements are "insufficient to create a jury issue in an ADEA case" unless linked to relevant personnel action).

There is simply no evidence in the record that Mr. Thiessen's "blocker" status or defendants' alleged blocker policy had any bearing on the decision to select other candidates for the RPC Manager positions. Significantly, Steve Joyce and Jeff Faucette, the two primary proponents of the blocker policy, left the employment of MWC in early 1994. Clearly, they had no involvement in the two challenged 1995 promotion decisions (and, in fact, Mr. Thiessen does not allege that they had any involvement in the promotion decisions). Robert Mills, the individual involved in the promotion decisions, averred that he had never been asked to implement any blocker policy and that he had never taken any adverse

37. Of course, courts will not always simply rely on an employer's assertion that it selected the most qualified candidate. *See, e.g., Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir.1995) (plaintiff withstands summary judgment on failure-to-promote claim despite City's contention that it hired the most qualified applicant where plaintiff presented evidence of pretext in hiring decision and City failed to fire successful candidate after it discovered candidate misrepresented her qualifications).

38. Although Mr. Thiessen does not specifically allege that Bret Plymire or Steve Pollack were identified as younger, "high potential" employees, the court assumes for purposes of this motion that these individuals were younger, "high potential" employees.

employment action pursuant to any blocker policy. *Cf. Eslinger v. U.S. Central Credit Union,* 866 F.Supp. 491, 498 (D.Kan.1994) (sufficient showing of discriminatory intent where alleged remarks were made by the same individual who ordered the challenged employment action). Moreover, there is no suggestion (and Mr. Thiessen does not allege) that Mr. Mills was present at any meetings during which the blocker concept was discussed or that he had any knowledge of Mr. Thiessen's blocker status. Finally, several witnesses testified that Gail Lanik publicly and unequivocally repudiated the blocker concept in the fall of 1994. Although Mr. Thiessen attempts to dispute this fact, even his "blocker" chronology ends in 1994.

In support of his argument that his "blocker" status is sufficient to create an inference of pretext, Mr. Thiessen directs the court to the Tenth Circuit's opinion in *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248 (10th Cir.1992).[39] The *Whalen* decision, however, is distinguishable and, in any event, is consistent with the court's holding today. In *Whalen,* the plaintiff filed an age discrimination suit against defendants' based on their failure to hire him after a corporate acquisition. 974 F.2d at 1250. Evidence was introduced at trial that the decisionmakers had requested lists of employees in declining order of age and that these lists were delivered to the decisionmakers at the time the challenged employment decision was made. On appeal, the Tenth Circuit found that the decisionmakers' request for employee lists in declining order of age (and the delivery of those lists) at the time the employment decision was made, along with other evidence, was susceptible to the reasonable inference that the plaintiff's age was a determining factor in defendants' actions and that defendants' proffered explanations were pretextual. *Id.*

Mr. Thiessen maintains that the *Whalen* case is significant (and analogous to this case) because the Tenth Circuit found that the employee lists could support an inference of pretext despite the absence of any evidence of a specific link between defendants' failure to hire Mr. Whalen and any actual use of the employee list. Thus, according to Mr. Thiessen, the "ultimate resolution of the nexus between defendants' discriminatory Blocker policy and plaintiff's claims is properly for the jury." *See id.* at 1253 ("Resolving the factual dispute over whether the lists were used for employment decisions would properly be a matter for the jury.").

Contrary to Mr. Thiessen's belief, the *Whalen* decision is entirely consistent with the court's determination that his "blocker" status is insufficient to create an inference of pretext in the absence of any evidence of a link between his blocker status and defendants' decision not to select him for the RPC Manager positions. In *Whalen,* the decisionmakers requested and received the employee list at the very time they were making the challenged employment actions. Here, there is no indication (and Mr. Thiessen does not allege) that the decisionmaker, Robert Mills, had any knowledge of the blocker lists or whether Mr. Thiessen had been designated as a "blocker." Moreover, the challenged decisions here occurred at least two years after the formulation of the blocker list and long after Gail Lanik repudiated the blocker policy or concept. In essence, other than his bare allegations that he was not selected for either position based on his "blocker" status, Mr. Thiessen has presented no evidence that the blocker policy or concept carried over into 1995. The mere fact that Mr. Thiessen was not selected for the RPC Manager positions after having been designated a "blocker," without more, simply does not support an inference that a causal connection existed between Mr. Thiessen's blocker status and the challenged employment decisions where a significant time lag exists between the two events. *Cf. Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) (unless the employer's adverse action "is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation"; four-month time lag between plaintiff's protected activity and his termination, without more, is insufficient to justify an inference of causa-

---

**39.** The relevant facts of the *Whalen* decision are set forth in more detail in section III.A.1 of this opinion.

tion); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (three-month period between plaintiffs' protected activity and her termination, standing alone, does not demonstrate a causal connection); *Redmond v. Day & Zimmerman, Inc.,* 897 F.Supp. 1380, 1386 (D.Kan.1995) (no inference of causal connection where defendant terminated plaintiff's employment more than three years after plaintiff filed initial charge of discrimination) (citing *Burrus v. United Tel. Co.,* 683 F.2d 339, 343 (10th Cir.1982) (plaintiffs failed to establish prima facie case of retaliation where three years passed between the filing of her charges and her termination)), *aff'd,* 85 F.3d 641 (10th Cir.1996).

In the absence of any nexus between Mr. Thiessen's "blocker" status and the challenged promotion decisions, Mr. Thiessen's "blocker" evidence is insufficient to show that defendants' proffered reasons for selecting other candidates for the RPC Manager positions were pretextual. Accordingly, the court grants defendants' motion for summary judgment on Mr. Thiessen's remaining claims of age discrimination.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion to decertify the collective action (doc. # 319) is **granted**. The court dismisses the opt-in plaintiffs Gene Autry; Pamela S. Chudyba; Gwen Colwell; Barbara A. Croy; Jan L. Cullison; Robert DeMartine; James C. Flower; Lawrence P. Fries; Terry M. Grisham; Elaine Hayden; Melva Heid; Linda L. Hess; Christopher P. Kaesberg; James Lawson; Brenda Lewis; Robert Marsonette; Ray Osburn; Kimberly Perron; Diana Polsinelli; Patricia Serra; Salli J. Shirey; and Janice F. Trice. Accordingly, defendants' motions for summary judgment with respect to each of the opt-in plaintiffs (docs. # 325, 327, 329, 331, 333, 335, 337, 339, 341, 343, 345, 347, 349, 351, 353, 355, 357, 359, 361, 363, 365 and 369) are **moot**.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant GECC's motion for summary judgment on the claims of non-employee plaintiffs (doc. # 371) is **moot**.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants' motion for summary judgment as to plaintiff Gary A. Thiessen's claims (doc. # 367) is **granted**.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiffs' motion to modify the pretrial order (doc. # 374) is **denied as moot**.

**IT IS SO ORDERED.**